# United States Court of Appeals for the Federal Circuit

_____

**CHECKPOINT SYSTEMS, INC.,**
*Plaintiff-Appellant,*

v.

**ALL-TAG SECURITY S.A. AND
ALL-TAG SECURITY AMERICAS, INC.,**
*Defendants-Appellees,*

AND

**SENSORMATIC ELECTRONICS CORPORATION,**
*Defendant-Appellee.*

_____

2012-1085

_____

Appeal from the United States District Court for the Eastern District of Pennsylvania in No. 01-CV-2223, Judge Petrese B. Tucker.

_____

Decided: March 25, 2013

_____

ROBERT J. PALMERSHEIM, Schopf & Weiss, LLP, of Chicago, Illinois, argued for plaintiff-appellant. With him on the brief were STEVEN A. WEISS and LESLEY G. SMITH. Of counsel on the brief were DENNIS R. SUPLEE and

THOMAS W. HAZLETT, Schnader Harrison Segal & Lewis LLP, of Philadelphia, Pennsylvania.

THEODORE A. BRIENER, Breiner & Breiner, L.L.C., of Alexandria, Virginia, argued for defendants-appellees. Of counsel on the brief were TRACY ZURZOLO QUINN, Reed Smith LLP, of Philadelphia, Pennsylvania, and M. KELLY TILLERY, ERIK N. VIDELOCK and CHARLES S. MARION, Pepper Hamilton, LLP, of Philadelphia, Pennsylvania.

---

Before NEWMAN, LOURIE, and SCHALL, *Circuit Judges.*

NEWMAN, *Circuit Judge.*

Checkpoint Systems, Inc. ("Checkpoint") sued All-Tag Security S.A., All-Tag Security Americas, Inc., and an All-Tag customer Sensormatic Electronics Corporation (collectively, "All-Tag") for infringement of U.S. Patent No. 4,876,555 ("the '555 patent"), entitled "Resonance Label and Method for its Fabrication." A jury found the '555 patent not infringed, invalid, and unenforceable. The district court entered judgment on the verdict, held the case "exceptional" in terms of 35 U.S.C. §285, and awarded the defendants approximately $6.6 million in attorney fees, costs, and interest. The patent term has expired, and only the award of attorney fees is appealed. We reverse the award, for the requirements of §285 were not met.

## BACKGROUND

Checkpoint and All-Tag are competitors in the manufacture and sale of "resonance tags." Resonance tags are electronic anti-shoplifting devices that are attached to merchandise whereby if the attached tag is not deactivated, for example by a cashier at check-out, the tag triggers an alarm when the tagged goods move past detectors located at the store's exit.

The patented resonance tag is constructed of three layers: a middle dielectric layer sandwiched between two conducting layers. The tag is deactivated in the check-out procedure by passing a strong current through the tag, which creates a short circuit between the conducting layers whereby no alarm is given to the detectors. Checkpoint's '555 patent is for a resonance tag that can be deactivated "at a lower current and with greater reliability." '555 patent Abstract. This property is achieved by placing a "throughhole" or "continuous hole" in the middle dielectric layer. *Id.* Claim 1 is representative:

1.  A deactivatable resonance label, comprising:

a dielectric layer having first and second opposed faces;

a first conducting layer on the first face of the dielectric layer, the first conducting layer being shaped to form an inductor and a first capacitor plate;

a second conducting layer on the second face of the dielectric layer, the second conducting layer being shaped to form a second capacitor plate, the first and second conducting layers being at least partially superimposed, said first and second conducting layers and said dielectric layer forming together an oscillating circuit; and

shorting means for enabling creation of a short-circuit between the first and second conducting layers when it is desired to deactivate the oscillating circuit, the shorting means being comprised of at least one throughhole passing through the dielectric layer to provide a short circuit path between the first and second conducting layers.

The issue of infringement was focused on whether All-Tag's resonance tags have such a throughhole in the

dielectric layer. The attorney fee award was based on Checkpoint's presentation of expert testimony analyzing the All-Tag tags, for the district court found that the tags that were examined by the Checkpoint expert were not the accused tags manufactured by All-Tag in Belgium, but earlier tags manufactured by All-Tag in Switzerland.

Checkpoint's expert was Dr. Markus Zahn, professor of electrical engineering at MIT. Checkpoint furnished Dr. Zahn with a roll of All-Tag tags to test for the infringing throughhole. To expose the critical dielectric layer, Dr. Zahn dissolved the conductive aluminum layer that covered the dielectric material. Dr. Zahn then examined the tags using a high-powered microscope; he observed that they had a throughhole in the dielectric layer, and he passed colored water through the hole to confirm this observation. Dr. Zahn's expert report, deposition, and testimony at trial described his procedures and results, including photographs.

Upon reviewing Dr. Zahn's deposition exhibits a few days before trial, All-Tag Security S.A.'s President and CEO Olivier Boels stated his belief that Dr. Zahn had tested tags that were not the current accused products. Mr. Boels stated that the tags that were tested were made by All-Tag Security A.G. in Switzerland, and were not the current tags which are made by All-Tag Security S.A. in Belgium. The record states that the roll of tested tags was acquired from an All-Tag customer "in the marketplace." Dr. Zahn testified that the serial number of the tags he tested was listed on All-Tag's website at the time of trial.

All-Tag moved to exclude Dr. Zahn from testifying, arguing that his infringement opinion was fatally flawed because the tags he examined were not the tags accused of infringement. The district court denied All-Tag's motion and permitted Dr. Zahn to testify.

Dr. Zahn testified that All-Tag's resonance tags contained a throughhole, and met all the terms of the asserted claims of Checkpoint's '555 patent. Dr. Zahn based his infringement opinion on his examination of the All-Tag tags, and on two All-Tag patents, U.S. Patent No. 5,187,466 ("the '466 patent") and No. 7,023,343 ("the '343 patent"). All-Tag stated that these patents generally describe the process that All-Tag Security S.A. was using in Belgium to produce the resonance tags that are charged with infringement, the '343 patent describing improvements over the process described in the '466 patent. Dr. Zahn explained that both of the All-Tag patents describe products having a hole in the dielectric layer, as required by the claims of the Checkpoint patent in suit. Dr. Zahn concluded that tags produced in accordance with the process in the All-Tag patents would infringe the Checkpoint '555 patent.

The record states that in 1994 All-Tag moved its manufacture of resonance tags from Switzerland to Belgium, and transferred its machinery and equipment to a newly formed Belgian company. The Belgian company resumed making resonance tags on the same equipment within about a week of the move.

Checkpoint filed this infringement suit in May 2001 against the All-Tag Belgian manufacturer and its United States company, in the United States District Court for the Eastern District of Pennsylvania. During pre-trial procedures, Checkpoint asked All-Tag to admit that its resonance tags contained a throughhole. All-Tag responded that its tags were made "generally in accordance with" All-Tag's '466 patent and the then-pending application for the '343 patent. All-Tag stated that it used the manufacturing process described in the '466 patent until April 2001, and that it thereafter modified the process as described in the '343 application. Both patents describe methods of producing at least one "hole" or "crater" or

"material free" area in the dielectric layer of a three-layer resonance tag.

The '466 patent describes making a resonance tag by burning "at least one hole" in the dielectric material using a heated rod. '466 patent col.2 ll.65-66. A "complete melting of the material" forms the "holes (craters)." *Id.* col.3 ll.18-22. The heated rod melts the dielectric material, which is "displaced completely" and "removed completely." *Id.* col.4 ll.6-22. This leaves a "hole **6**" and an "air gap **S**." *Id.* Fig. 4. Checkpoint's expert Dr. Zahn referred to this description of the All-Tag process as producing a product covered by Checkpoint's '555 patent.

The '343 patent states that its object is to produce a resonance tag "having as small as possible a material free distance (deactivation area) between two opposite capacitor plates." '343 patent col.2 ll.50-57. The '343 patent describes a process whereby a heated tool melts away the dielectric material such that "[a] short circuit is thus obtained between the plates without any dielectric material remaining between them." *Id.* col.3 ll.6-21. The process is said to "ensure" that "there is no dielectric material between the capacitor plates in the deactivation zone." *Id.* col.3 ll.45-48. The figures show this material-free gap **7** between the capacitor plates. *Id.* Fig. 6. Dr. Zahn referred to this description as well.

At the close of Checkpoint's infringement case, All-Tag moved for judgment as a matter of law, on the ground that Dr. Zahn's testimony was unreliable because he did not know All-Tag's exact process and did not test All-Tag's present products. The court denied the motion, stating that "[t]he testimony is sufficient at this point for us to continue this matter."

All-Tag presented no contradictory evidence. All-Tag's expert Dr. Christopher Rose testified that he had not examined the All-Tag tags. Dr. Rose testified:

> I don't have any evidence to present to this jury to say that there is or is not a hole, that there is short-circuiting through the hole or there is not short-circuiting through the hole. You have to find these things out.

Dr. Rose did not state that the accused tags did not contain a hole as described in the All-Tag manufacturing patents. No All-Tag witness so testified, and All-Tag's counsel did not so argue.

All-Tag renewed its JMOL motion at the end of the evidentiary presentations. The court again denied the motion, stating that "the evidence is sufficient to go to the jury on the issue of infringement."

Although All-Tag had acknowledged in its Admissions that its tags were made "generally in accordance" with its patents, All-Tag argued to the jury that Dr. Zahn did not know what "generally" meant and so could not definitively determine whether the All-Tag tags were within the Checkpoint patent. The jury returned a verdict in favor of All-Tag, finding that All-Tag did not infringe the '555 patent and that the '555 patent was invalid and unenforceable. Judgment was entered on the verdict. *Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, No. 01-cv-2223 (E.D. Pa. June 20, 2008), ECF No. 275.

All-Tag then moved for attorney fees pursuant to 35 U.S.C. §285:

> The court in exceptional cases may award reasonable attorney fees to the prevailing party.

The district court granted the motion. The court explained that the case was exceptional because Checkpoint through its expert witness did not inspect the tags it accused of infringement, despite having ample opportunity to do so. The district court stated, "that Checkpoint never looked at the accused products in relation to the '555 patent . . . alone warrants an exceptional case find-

ing." *Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, No. 01-cv-2223, 2011 WL 5237573, at *1 n.1 (E.D. Pa. Nov. 2, 2011). This appeal is directed to the award of attorney fees; the '555 patent has expired.

## DISCUSSION

The general rule, called the "American Rule," is that each side shall normally bear its litigation burdens. The philosophy of the American Rule is to avoid that "the poor might be unjustly discouraged from instituting actions to vindicate their rights if the penalty for losing included the fees of their opponents' counsel." *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 718 (1967); *see Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 251 (1975) (explaining the concern that "losing litigants were being unfairly saddled with exorbitant fees for the victor's attorney").

The American Rule is not absolute, for the policy of avoiding undue burden on access to judicial remedy gives way when litigation is devoid of any justification, or is tainted by grievous misconduct. Section 285 codifies for patent cases the policy of "compensating the prevailing party for the costs it incurred in the prosecution or defense of a case where it would be grossly unjust, based on the baselessness of the suit or because of litigation or Patent Office misconduct, to require it to bear its own costs." *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1309-10 n.1 (Fed. Cir. 2012). To receive attorney fees under §285, "a prevailing party must establish by clear and convincing evidence that the case is 'exceptional.'" *Id.* at 1308.

In turn, patentees seeking to assert their government-granted patent rights, and accused infringers with grounds for believing the patent to be invalid or not infringed, are shielded from the additional litigation burden of fee-shifting when their positions are reasonable. In *Highmark* the court explained: "It is established law

under section 285 that absent misconduct in the course of the litigation or in securing the patent, sanctions may be imposed against the patentee only if two separate criteria are satisfied: (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless." *Id.* "To be objectively baseless, the infringement allegations must be such that no reasonable litigant could reasonably expect success on the merits." *Id.* at 1309 (quoting *Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*, 524 F.3d 1254, 1260 (Fed. Cir. 2008)).

On appellate review of an attorney fee ruling this court determines *de novo* whether the litigation was objectively baseless, *id.* at 1309-10 & n.1, and the district court's findings regarding subjective bad faith are reviewed for clear error. *Id.* at 1310. Thus this court may conduct "a retrospective assessment of the merits of the entire litigation" to determine "whether the record established in the proceeding supports a reasonable argument as to the facts and law." *Id.* at 1310 n.1.

Here, the district court stated: "The Court further found that Plaintiff's claim was brought in bad faith, the basis for its finding of an 'exceptional' case." The district court faulted Checkpoint for "only examin[ing] tags from All-Tag A.G. of Switzerland, not the Actual Accused Product manufactured by All-Tag S.A. of Belgium." The district court stated that "All-Tag provided all parties with samples of the Accused Product on November 22, 2002, giving Checkpoint ample time to have the expert's infringement analysis completed."

Checkpoint argues that it was not objectively baseless to bring or continue this suit based on the tags tested by Dr. Zahn, even if those tags were made in Switzerland before the move to Belgium. Checkpoint stresses that when All-Tag moved its equipment from Switzerland to Belgium, the Belgian operation resumed manufacture within a week, on the same equipment. All-Tag did not

show at trial that All-Tag Switzerland's resonance tags differed from All-Tag Belgium's tags in any respect material to infringement of the '555 patent, although All-Tag witnesses testified that All-Tag was continually making manufacturing improvements.

There was no evidence that All-Tag's equipment produced tags with throughholes in Switzerland but without throughholes in Belgium. In a pre-trial motion for summary judgment, All-Tag's counsel stated that "it is undisputed that All-Tag S.A. purchased equipment and other assets from All-Tag A.G., and continued to manufacture the same resonant tags which were previously manufactured by All-Tag A.G." *Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, No. 01-cv-2223 (E.D. Pa. Aug. 15, 2006), ECF No. 165, at 4.

As we have discussed, Dr. Zahn referred to the description of All-Tag's products in All-Tag's patents, for All-Tag stated that it was practicing the process in these patents. Mr. Boels, All-Tag's CEO, testified that the All-Tag patents explain how All-Tag manufactured its resonance tags:

> Q. So if somebody wanted to understand how All-Tag makes its product, is it enough to just read the patent? Does the patent tell you everything about how you actually make your product?
>
> A. I believe. I think so.

The '343 patent states that the process "ensures that there is no dielectric material between" the conductive layers. '343 patent col.3 ll.45-48. Dr. Zahn reviewed the '343 patent and determined that a resonance tag made in accordance with that method would have a hole in the dielectric layer. Both the '466 and '343 patents show that the products have holes in the dielectric, as claimed in Checkpoint's '555 patent.

All-Tag argues that Dr. Zahn's reliance on the All-Tag patents was unreasonable because of the qualifier "generally" in All-Tag's pre-trial "Admission" that its manufacturing process practiced the All-Tag patents. All-Tag states that "generally" does not mean "exactly," and that Checkpoint should not have relied on the admission. However, a party may rely on an admission as "conclusively established" unless the admission is recanted. *See* Fed. R. Civ. P. 36(b) ("A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended."); *Ajinomoto Co. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338, 1351 (Fed. Cir. 2000) (pre-trial infringement admissions were binding because accused infringer "offered no correction of these admissions before the court's judgment").

All-Tag provided no evidence and presented no argument that its pre-trial admission was incorrect. All-Tag's expert Dr. Rose testified that he did not examine the accused tags, although Dr. Rose conceded that All-Tag would infringe if the "physical reality" matched the description in the All-Tag patents. As to All-Tag's '466 patent, Dr. Rose testified:

> So, if the physical reality is exactly [as shown in the patent], if that is the physical reality, then again, we are done, I agree.

Similarly, as to the '343 patent, Dr. Rose testified:

> So, if the product reflected -- so, if the recipe specified in that patent gave you exactly what they say in the patent . . . then again I think we are done. Because what they say in the patent is that there is an air gap, there is no dielectric in between anything . . .
>
> What that means is if the physical reality of the product is exactly as described in the patent, then

> I -- I think we would have infringement . . . . I can't say infringement. I would say that we have a throughhole.

All-Tag cites *L & W, Inc. v. Shertech, Inc.*, 471 F.3d 1311 (Fed. Cir. 2006), where this court rejected the assessment of liability based solely on the alleged infringer's statements that the accused products are "covered" by its own patent, because the patent included multiple embodiments and it was unclear whether the patent disclosed the critical infringing feature. In contrast, All-Tag's '466 and '343 patents are specific to resonance tags having a hole in the dielectric; the All-Tag patents describe no embodiments without the hole, which is the critical feature of Checkpoint's '555 patent. All-Tag's admission that its products are made "generally in accordance" with its patents could reasonably have been relied on by Checkpoint and its expert Dr. Zahn. Such reliance was not "objectively baseless." *See Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1374 (Fed. Cir. 2009) (rejecting "a general rule requiring one who alleges infringement of a claim containing functional limitations to perform actual tests or experiments on the accused product or method").

The infringement charge was not shown to have been made in bad faith or objectively baseless. The district court's determination that this was an exceptional case under §285 is not supported by the record. The award of attorney fees with costs and interest is reversed.

**REVERSED**